**In re David LESONIK, Debtor.**

**Gary V. Skiba, Trustee, Plaintiff,**

**v.**

**David Lee Lesonik; Shera D Lesonik, Now By Marriage, Shera D. Mcqueen; United States of America, Internal Revenue Service; Hamot Medical Center of the City of Erie, Pennsylvania, Defendants.**

**Gary V. Skiba, Trustee, Movant,**

**v.**

**David Lee Lesonik, Respondent.**

**No. 98–12281.**

**Adversary No. 99–1073.**

United States Bankruptcy Court, W.D. Pennsylvania.

March 2, 2000.

---

David Lee Lesonik, Erie, PA, pro se.

Donna P. Leone, IRS District Counsel, Pittsburgh, PA, for creditor.

## MEMORANDUM

WARREN W. BENTZ, Bankruptcy Judge.

The within bankruptcy was filed by David Lee Lesonik on December 24, 1998. Debtor filed without an attorney. He apparently had help from John Lovin, a Petition Preparer, who performed his services for no compensation (according to the DISCLOSURE OF COMPENSATION OF BANKRUPTCY PETITION PRE-PARER).[1]

David Lee Lesonik had been married to Shera D. Lesonik; they were divorced

January 23, 1998. Shera remarried and is now known as Shera D. McQueen.

At Adversary No. 99–1073, the Trustee sought permission to sell real estate at 306–308 West Second Street, Erie, Pennsylvania, to a proposed buyer for $40,000; that premises was owned by David Lee Lesonik and Shera D. Lesonik; when those parties divorced on January 23, 1998, they became tenants in common of the subject property. A hearing on the Trustee's Complaint was held on August 23, 1999, and the private sale requested by the Trustee was confirmed, divesting the interests of David Lee Lesonik and Shera D. Lesonik; the lien of Hamot Medical Center against both David and Shera in the amount of $2,436.72, plus costs, was divested and transferred to the proceeds; so also the liens of the Internal Revenue Service, which were subsequent to the Hamot Medical Center judgment lien, and which were against David only, totaling some $115,000, were divested and transferred to that portion of the proceeds to which David would have been entitled.

It appears that the Internal Revenue Service has not filed a proof of claim, but since its lien was divested by order of court, it awaits an order of distribution of the sale proceeds in its favor, at least to the extent that David would be entitled to such proceeds after payment of the Hamot Medical Center lien.

### 1. Debtor's Objection to the IRS Lien.

The Debtor has filed an objection to the Internal Revenue Service ("IRS") claim. Apparently, the Debtor has not filed tax returns and the IRS has undertaken to estimate his taxes. After notice and hearing, the Debtor failed to produce any evidence as to what his tax liability ought to be. Debtor, instead, argues in a somewhat scattered fashion, that he does not owe the IRS any money. The Debtor's position seems to boil down to two fundamental objections.

---

1. John Lovin, purported to have been acting as a Petition Preparer here, has been found by this Court in other cases to have been practicing law and ordered to cease and desist.

First, the Debtor argues that under a proper interpretation of the Internal Revenue Code, he is not a "person liable," nor is he a "taxpayer," nor is he "liable," nor is he "subject" to a liability for taxes. It seems remarkably clear, however, that the Internal Revenue Code, Title 26 U.S.C.A. § 1 imposes an income tax on all individuals subject to the laws of the United States: "There is hereby imposed on the taxable income of every individual...," substantially tracking the language of Amendment XVI of the United States Constitution. It then goes on to define taxable income and method of computation of the tax. There is no room for argument as to the applicability of the Internal Revenue Code. Its language clearly imposes tax liability upon all of us.

The second major thrust of the Debtor's argument relates to the fundamental relationship between the Debtor and the government. He argues that there is a difference between a "citizen individual" who is a "taxpayer" and a "person liable," on the one hand, and on the other hand, a "citizen" who is a "natural sovereign individual," or a "freeman." He asserts that a "taxpayer" citizen can have his rights invaded or be made subject to governmental regulation but a person who is a "natural sovereign individual" is not subject to governmental laws—that he is a person "superior to government;" that he retains his "god-given inalienable rights"—as guaranteed by the Constitution. Debtor does not cite any particular portion of the Constitution in support of his position.

 We think it inescapable that individual human beings residing within the United States are subject to the laws of the United States, including the tax laws. Debtor cannot, by calling himself a "natural sovereign individual," or a "freeman," escape the obligations that each of us bears as a citizen of these United States.

Since the Debtor offered no factual information in dispute of the IRS claim secured by its lien, the claim underlying the lien must be sustained. Thus, the IRS will have a lien on all of the share of the real estate proceeds to which David Lesonik would be entitled.[2]

### 2. The Lien Claim of Hamot Medical Center.

The lien claim of Hamot Medical Center, predating the IRS lien, must be paid in full out of the joint net proceeds of the sale of the real estate, prior to costs, and prior to the IRS liens.

### 3. The Claim of Shera D. Lesonik/McQueen.

Shera D. Lesonik/McQueen seems to contend that she is entitled to her one-half of the proceeds of sale of 306–308 West Second Street, Erie, PA, after costs and payment of the Hamot Medical Center lien. She has never appeared in Court, although she has been notified of various hearings. It appears that David and Shera had arranged to sell the subject real estate to K–D Rentals, LLC, and a closing was to occur December 16 or 17, 1998. The closing was aborted when the federal tax liens became known, and then the within bankruptcy was filed by David.

---

2. The sequence of events and the probable reasoning provide a plausible explanation of David's actions, even though the story is irrelevant to the disposition of the matters before us: The IRS had filed notices of liens against David (but not against Shera). David knew that the notices were not liens on the residence because it was owned by David and Shera as tenants by the entireties. David therefore understood that he could sell his residence free of the IRS claim and keep the proceeds without paying the IRS anything.

As the contemplated closing on the sale of the residence approached in December, 1998, David learned that upon the entry of his divorce decree on January 23, 1998, he and Shera became tenants in common, and the IRS notices had ripened into liens against David's one-half undivided interest. The contemplated closing was aborted. David then, with the help of John Lovin (a tax preparer of proven incompetence), filed the within bankruptcy, futilely seeking this Court's help in circumventing the IRS lien.

Shera resided in Youngsville, Pennsylvania. The closing attorney, Norman A. Stark, Esq. ("Stark"), sent Mr. and Mrs. McQueen a letter dated December 9, 1998 (Exhibit 1) enclosing the unexecuted deed and asking that they execute it before a notary and return it promptly. The letter also stated:

It is also our understanding that there was a verbal agreement in which you waived any monetary rights to any proceeds from the sale of this property. If this is your understanding, please sign this letter and return it to us. If this is not correct, please state what the correct agreement is and if there is any document supporting your position. If one exists, please send us a copy.

Shera D. McQueen and Henry L. McQueen executed the deed, signed the letter and returned both to Stark. Prior to sending the letter, Stark had learned Shera's desire to waive her right to her share of the proceeds; he then telephoned and verified that such was her desire; he then drafted and sent the letter.

The Trustee now asserts that by the letter of December 9, 1998, Shera Lesonik/McQueen intended to and did give up her interest in the real estate. Shera, however, in an undated, notarized communication to the Trustee, filed with the Court August 5, 1999, explains that she was only giving permission for her ex-husband, David Lesonik, to pick up "my one-half share of the proceeds of the sale of our property at 306–308 West Second Street, Erie." The implication is that David would transmit the proceeds to her, although the communication does not so state specifically. At a subsequent hearing on the above matters held January 12, 2000, David Lesonik requested further time to submit additional briefs, which was granted, and subsequently, there was filed with the Court on January 24, 2000, a notarized acknowledgement of a communication from Shera dated January 21, 2000, saying that the Trustee "mistakenly took (the letter of December 9, 1998) to say that

I was giving up my right to any of the proceeds from the sale of our property. My intention was only to relieve that law firm from any liability for allowing my ex-husband to pick up my share." Again, the implication of the communication is that the money belongs to her, although the note does not say so. She asks that she have her day in Court to tell "my side of the story in defense of our property." Shera was given notice of the prior hearings and notice of the evidentiary hearing specially scheduled on January 12, 2000 to hear any evidence which any party might like to offer. She has not attended any of the hearings.

The testimony of David Lesonik in support of the hearsay writings of his ex-wife is hardly believable. He would have us believe that Shera would mail the executed deed to Stark, thus relying on Stark to disburse all of the sale proceeds, yet not trust Stark to mail to her her one-half share.

Moreover, David was not going to appear at the closing scheduled in December, 1998. David was in Georgia, and had given a "power of attorney" to one Russell Atkins to attend the closing and collect the proceeds. Thus, Shera gave David the right to pick up her money, and David purportedly gave the right to Russell Atkins, presumably without Shera's knowledge or consent.

It seems to the Court that if the sale transaction scheduled in December, 1998 had been consummated, that the closing attorneys would have been protected by Shera's written authorization if they paid all the net proceeds over to David. However, once that closing aborted, it may be difficult to say that the signed waiver of the right to proceeds of that certain sale is the same as a signature on a deed transferring all ownership to David. However, we cannot accept the hearsay statements purportedly written and signed by Shera to constitute any evidence of ownership, and if she declines to enter an appearance in Court, or step forward to offer testimo-

ny, then it will be extraordinarily difficult to rule in her favor.

### 4. *Trustee's Objections to Exemptions.*

The Trustee's objections to the exemptions claimed by the Debtor may be moot, since all property of the estate may be subject to the IRS statutory lien, and therefore, it may be that nothing will be available for Debtor's exemptions. Determination of the Trustee's objections will therefore be deferred to a later date.